IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TROY SHESLER,

               Plaintiff,

    v.

PAULETTE SANDERS, JEAN KRAINTZ,
KAYE MEISSNER, RITA HAROSKI,
and RENEE HACKBARTH,

               Defendants.

OPINION & ORDER

13-cv-394-jdp[1]

---

       Plaintiff Troy Shesler served about two years in state prison that, by law, he should never have served. The defendants are employees of the Department of Corrections, whose job was to make sure that Wisconsin inmates served the right amount of time. They should have caught the error in plaintiff's sentence, but they did not. Plaintiff has reason to be upset.

       Plaintiff, now a former inmate, brings this lawsuit under 42 U.S.C. § 1983 alleging that defendants violated his rights under the Eighth and Fourteenth Amendments[2] by failing to correct his illegally long criminal sentence. The question in this case is not whether the defendants competently dispatched their duties. Rather, the question is whether they demonstrated "deliberate indifference" to plaintiff's constitutional rights. Defendants' failure to detect the unlawful term to which plaintiff had been sentenced is a truly lamentable error, but

---

[1] This case was reassigned to me pursuant to a May 20, 2014 administrative order. Dkt. 12.

[2] I understand plaintiff to be attempting to bring substantive due process claims in addition to his Eighth Amendment claims. However, "if a constitutional claim is covered by a specific constitutional provision, such as the . . . Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *see also Russell v. Lazar*, 300 F. Supp. 2d 716, 721 n.3 (E.D. Wis. 2004) ("even if plaintiff had a substantive due process right to be released on his MR date, such a right would be identical to his Eighth Amendment right not to be incarcerated beyond the expiration of his sentence."). Additionally, the parties brief plaintiff's claims as if they are all subject to the Eighth Amendment's deliberate indifference standard. Accordingly, I need not discuss the due process claims separately in this opinion.

their conduct does not rise to the level of deliberate indifference. The distinction between an error and deliberate indifference is not a mere technicality. We do not charge government officials with constitutional-level violations because they make mistakes on the job, even if those mistakes have serious consequences as they did here. To do so would subject government officials to unending litigation challenging the quality of their job performance. The state of Wisconsin could provide a remedy to plaintiff, if it chooses to, but the federal Constitution does not.

Currently before the court is defendants' motion for summary judgment. Because plaintiff fails to present evidence that could lead a reasonable jury to conclude that any of the defendants acted with deliberate indifference toward the risk that plaintiff would be incarcerated longer than allowed under Wisconsin law, I will grant defendants' motion for summary judgment.

UNDISPUTED FACTS

The following facts are undisputed, except where noted.

Plaintiff Troy Shesler is a Louisiana resident. He previously was incarcerated in the state of Wisconsin prison system. In 2003, plaintiff was convicted of operating a motor vehicle while intoxicated (fifth or higher offense) in Racine County Circuit Court case no. 03CF729. At that time, the offense was a Class H felony. Under the then-newly passed "Truth in Sentencing II" laws, this conviction carried a potential maximum term of initial confinement in prison of three years and maximum term of extended supervision of three years. On October 6, 2003, plaintiff was sentenced to 18 months of initial confinement and 3 years, 6 months of extended supervision. The term of extended supervision exceeded the statutory maximum.

2

After Truth in Sentencing II was enacted in 2003, it was "not uncommon" during the remainder of 2003 for judges throughout the state of Wisconsin to erroneously sentence persons convicted of Class H felonies to unlawfully long periods of extended supervision.

About October 16, 2003, plaintiff was received at the Dodge Correctional Institution to begin serving the incarceration portion of his sentence. About December 10, 2003, plaintiff's sentence was reviewed by defendant Jean Kraintz, an Offender Records Assistant 3 at DCI. Kraintz reviewed plaintiff's judgment of conviction and used it to fill out an "admission computation sheet." At all times relevant to this action, Kraintz was a lead worker, but not a supervisor.

Plaintiff's sentence was also reviewed by Kaye Meissner, another Offender Records Assistant 3 at DCI. As the second person to check plaintiff's sentence calculation on the admission computation sheet, it was Meissner's job to "proof" the calculations that had already been made. In proofing the sentence computation, she was responsible to check every computation according to the information on the judgment of conviction.

Part of Kraintz's and Meissner's job responsibilities was to ensure the legality of each sentence they reviewed. When records office staff determined that an offender received an illegally excessive sentence, DOC procedures required staff to draft and distribute a letter to the court, district attorney, defense attorney, and offender, advising them of the DOC's statutory responsibility regarding the reduction of the sentence. If no response to that letter was received, DOC staff had the authority to correct the sentence themselves. Kraintz estimates that right after the law changed, she had to seek corrections in as many as 40 percent of the sentences that she saw. Defendant Meissner said the number of unlawful sentences could have been as many as five or six a day.

3

In addition to their own training and knowledge of sentencing law, Kraintz and Meissner could refer to a penalty chart that showed the maximum penalties for each class of offense. According to defendant Paulette Sanders, the DCI Offender Records Supervisor, staff performing these reviews were directed to consult the penalty chart. However, neither Kraintz nor Meissner consulted the chart when reviewing plaintiff's conviction, although they do state that they knew the maximum term of extended supervision for a Class H felony was three years.[3]

In reviewing plaintiff's sentence, defendants Kraintz and Meissner "somehow . . . accidentally missed the error in [plaintiff's] sentence with respect to the length of his Extended Supervision; their mistake was completely unintentional and inadvertent, and they did not become aware of it until they were made aware of this lawsuit." Dfts.' PFOF ¶ 21, Dkt. 17.

Plaintiff remained incarcerated until he was released on extended supervision on January 4, 2005. Had defendants Kraintz or Meissner noticed the illegal sentence, plaintiff's extended supervision would have expired on January 6, 2008. However, because of the extra six months on the illegally long sentence, his extended supervision was scheduled to expire in July 2008.

On May 6, 2008, plaintiff was charged with new misdemeanor offenses and he was placed on a hold by his probation agent. On May 13, 2008, a decision was made to seek revocation of plaintiff's extended supervision. Plaintiff's probation agent asked the DCI Records Office how much time plaintiff had available for reincarceration. Defendant Rita Haroski, an Offender Records Assistant 3 at DCI, did not notice that plaintiff's sentence was illegally long. Instead, she provided plaintiff's probation agent with information that plaintiff had three years,

---

[3] Defendant Meissner explicitly states that she did not consult the penalty chart. Defendant Kraintz does not specifically state whether she used the penalty chart, but a reasonable jury could infer this from her statement that it was unnecessary to consult the chart because she already knew the maximum term of supervision.

six months, and two days available for reincarceration. Haroski gave that response after referring to the admission computation sheet filled out by defendant Kraintz. Haroski did not refer to plaintiff's judgment of conviction.

According to Haroski, in 2008, the procedure at the Dodge Correctional Records Office for this task was not to review the judgment of conviction or to compare the sentence to the penalty chart but rather to formulate a response by looking just at the admission computation sheet, which did not contain the date of the offense or the level of offense. However, according to defendant Sanders, staff performing this type of sentence review were directed to review the judgment of conviction and consult the penalty chart.

Plaintiff waived his revocation hearing, and was ordered to be reincarcerated for 37 months. On September 18, 2008, Plaintiff was received at DCI, having been incarcerated continuously up to that time after being jailed on a probation hold on May 6, 2008. On October 13, 2008, defendant Haroski calculated plaintiff's reincarceration sentence on a DOC "escapee/violator" form. Haroski made no effort to determine whether plaintiff's original sentence was legal or illegal. The reincarceration sentence was proofed by Renee Hackbarth, another Offender Records Assistant 3, but she did not notice the illegal sentence either.

By this time, both defendants Haroski and Hackbarth were aware that there was a risk of judicial oversentencing in felony Class H cases and they knew that this type of felony carried a three-year maximum term of extended supervision. However, they were not aware that plaintiff's original admission computation was incorrect, nor did they have a reason to think that it would be incorrect. They state that it was long-standing administrative practice not to review the original judgment of conviction in order to determine whether the original admission computation was correct. Defendant Sanders states that staff were directed to consult the original judgment of conviction.

5

Plaintiff was released from prison on December 14, 2010, after the registrar at the Oakhill Correctional Institution noted the illegal sentence and contacted the sentencing court. Because of defendants' failure to notice his illegal sentence, he spent 122 extra days on supervision until he was jailed on a probation hold (January 6, 2008 to May 6, 2008),[4] 588 extra days incarcerated (May 6, 2009 to December 14, 2010)[5] and another 185 extra days on supervision (December 14, 2010 to June 16, 2011).[6]

A study conducted by plaintiff of most of the 2003 Class H and Class I felony cases from Milwaukee and Waukesha Counties uncovered 22 cases in which criminal defendants received unlawfully long sentences. Defendants admitted that in 19 of the cases, the DCI official making the initial calculation failed to catch the error, and it was unclear what happened in the other three cases, as the records had been destroyed.[7]

---

[4] Although plaintiff's submissions are somewhat unclear on this point, it seems that he believes this length of time is 123 days, which appears to be an incorrect calculation, although any discrepancy is immaterial for purposes of this opinion.

[5] Plaintiff concedes that he likely would have been revoked for a year on a separate criminal conviction (a 2003 conviction for theft of property worth less than $2500 in Racine County Circuit Court case no. 03CF731, with a sentence of one year in prison followed by one year on extended supervision, imposed and stayed) even had his probation in case no. 03CF729 terminated after the three-year maximum time allowable under Wisconsin law. After taking this second conviction into account, plaintiff estimates that he would have spent 588 extra days in prison because of the incorrectly assessed probation time in for the revocation in case no. 03CF729.

[6] Plaintiff argues that without the revocation in case no. 03CF729, he would have completed extended supervision on case no. 03CF731 on May 6, 2010, so any time he spent on extended supervision after that would have been due to the illegal sentence and defendants' failure to catch the error.

[7] Plaintiff states that the initial check failed in 17 of these cases, but he appears to be giving credit to defendants for eventually uncovering the error in two of the cases. However, defendants admit that the errors were not caught at the initial computation stage of these two cases. It is unclear whether any of the other offenders' sentences were ever corrected.

Defendant Kraintz did not perform the initial calculation in any of these cases. Defendant Meissner was the "proofer" on nine of them. In two of the cases, the apparent error was eventually caught; one of those sentences turned out to be legal and the other was fixed.

Defendant Sanders became the Records Supervisor at DCI in 2002. Her position required her to "ensure the lawful commitment and release of prisoners, to oversee the ongoing processing of offender records, to ensure implementation of statutes and administrative rules relating to lawful commitment of offenders, oversee the supervision and training of Records Office staff, develop and implement Records Office policy and procedures, to maintain extensive knowledge of the statutes and administrative rules pertaining to the lawful commitment and release of adult inmates, to develop and implement administrative procedures and operations and to evaluate their efficiency and effectiveness, and to monitor and oversee accurate production of offender sentence structures and release dates by auditing legal documents and computations."

Although Sanders's job description required that she monitor that inmates were being released according to law by auditing documents and computations, and although she was sometimes made aware of unlawful sentences that had not been noted in her office when staff at another institution found the error and brought it to her attention, she never undertook a formal auditing process.

Sanders asserts that she provided the required monitoring by reviewing the work of her staff when they requested that she do so, and providing them with penalty charts to use. However, contrary to Sanders's assertions, defendants Haroski and Hackbarth state that it was long-standing administrative practice for staff performing review at revocation *not* to review the original judgment of conviction in order to determine whether the original admission computation was correct. Thus, the penalty charts would not have been useful, because the

felony type (which was matched to the penalty chart) was included only in the judgment of conviction.

Sanders's performance evaluations of eleven Offender Records Assistant 3 employees shows that only three of them (and none of the four other defendants in this case) were specifically evaluated on the job objective stating "prior to performing computation, review all legal documents or commitment papers for legality of sentence and determine applicable law."

Sanders was not aware of plaintiff's illegal sentence until this lawsuit was initiated. Nor was she aware of the numerous illegal sentences uncovered by plaintiff's research into criminal cases in Milwaukee and Waukesha Counties.


ANALYSIS

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex*, 477 U.S. at 322.

Plaintiff brings claims against defendants for violating his Eighth Amendment rights against cruel and unusual punishment by failing to correct his unlawful sentence, which resulted

in him being illegally incarcerated and serving extra time on extended supervision. Plaintiff alleges that defendants failed to notice the illegally long sentence on the following occasions:

- Defendant Kraintz's initial review of plaintiff's sentence upon plaintiff's arrival at DCI;

- Defendant Meissner's proofing of Kraintz's review;[8]

- Defendant Haroski's review after plaintiff's probation agent asked her for the time available for plaintiff's reincarceration;

- Defendant Haroski's review after plaintiff arrived at DCI following probation revocation; and

- Defendant Hackbarth's proofing of Haroski's review.

Plaintiff also brings claims against defendants Kraintz and Sanders for failing to train or supervise the process by which sentences were reviewed.

To succeed on his claims, plaintiff needs to show that "defendants held him beyond the term of his incarceration without penological justification, and that the prolonged detention was the result of the defendants' 'deliberate indifference.'" *Armato v. Grounds*, No. 13-1995, 2014 WL 4370672 at *6 (7th Cir. Sept. 4, 2014) (citing *Campbell v. Peters*, 256 F.3d 695, 700 (7th Cir. 2001). Courts have broken this type of claim into three elements:

> "First, a plaintiff must demonstrate that a prison official had knowledge of the prisoner's problem and thus of the risk that unwarranted punishment was being, or would be, inflicted. Second, the plaintiff must show that the official either failed to act or took only ineffectual action under the circumstances, indicating that his response to the problem was a product of deliberate indifference to the prisoner's plight. Finally, the plaintiff must show a causal connection between the official's response to the problem and the unjustified detention."

*Watford v. Miller*, No. 09-C-244, 2010 WL 1257812, *4 (E.D. Wis. Mar. 26, 2010) (quoting *Moore v. Tartler*, 986 F.2d 682, 686 (3d Cir. 1993)). "Deliberate indifference requires more than

---

[8] Plaintiff does not include Meissner's actions in the "violations of law" section of his amended complaint. However he does allege that Meissner acted with deliberate indifference elsewhere in the complaint, and the parties brief this claim, so I will consider it at summary judgment.

negligence, rather the defendant must meet essentially a criminal recklessness standard, that is, ignoring a known risk." *Armato*, 2014 WL 4370672 at *6 (internal quotation marks omitted).

**A.  Initial review of plaintiff's sentence**

Plaintiff first argues that defendants Kraintz and Meissner violated his Eighth Amendment rights by failing to notice that he had been given an unlawfully long period of extended supervision. Kraintz performed the original admission computation of Shesler's sentence upon plaintiff's reception at DCI and Meissner proofed the computation.

Defendants concede that plaintiff was given an illegally long period of extended supervision. They also admit that in the wake of the enactment of Truth in Sentencing II, it "was not uncommon" for judges to hand down this type of illegally long sentence. Defendant Kraintz estimates that when sentencing laws were changed, as many as 40 percent of sentences would need to be corrected. Defendant Meissner testified that staff would have to correct up to five to six sentences a day. Thus the record shows that Kraintz and Meissner were aware of the risk faced by prisoners like plaintiff who were sentenced in the wake of the enactment of Truth in Sentencing II. The evidence also shows a causal connection between defendants' failure to correct the unlawful sentence and plaintiff's illegal confinement; if Kraintz and Meissner had correctly performed their jobs, they would have uncovered the illegal sentence.

This leaves the key issue: whether defendants were deliberately indifferent to the risk plaintiff faced. Both Meissner and Kraintz reviewed plaintiffs' conviction but failed to catch the illegally long term of extended supervision. Defendants characterize these failures as mistakes by both defendants. More specifically, defendants testified in their depositions as follows:

- "I don't know if I was interrupted in the middle of doing a computation. I don't recall this one specifically." Dkt. 25 (Kraintz dep. at 14:3-5).

- "I believe that you just might have something else going on and just space out a little." Dkt. 26 (Meissner dep. at 20:11-12).

Based on these responses, defendants argue that their actions were at worst negligent, which is not actionable under the Eighth Amendment.

Plaintiff frames the issue more narrowly, focusing on the specific failure of the defendants to consult the penalty chart while performing their reviews, which presumably would have made them more likely to notice the sentencing error than just relying on their memory of the maximum penalties alone. Plaintiff characterizes this failure as "[i]gnoring the part of their job requirement that they examine each sentence for legality."

The problem for plaintiff's position is that it does not square with the concept of deliberate indifference or the undisputed facts of the case. There is no evidence that defendants "ignored" their duty to review the legality of plaintiff's sentence in the sense that they intentionally chose not to review the sentence. Rather, the undisputed facts show that they inadvertently botched their reviews. At most, this is garden-variety negligence,[9] which is not actionable under § 1983. By comparison, the cases plaintiff cites in support of this type of a claim involve more than simple negligence; rather, they involve instances of officials disregarding specific complaints brought by the confined individual or intentionally continuing the confinement. *See, e.g.*, *Campbell v. Peters*, 256 F.3d 695 (7th Cir. 2001) (suggesting that officers who were aware of plaintiff's complaints about incorrect sentence calculation violated Eighth Amendment); *Armstrong v. Squadrito*, 152 F.3d 564, 580 (7th Cir. 1998) (jail officials acted with deliberate indifference toward pre-trial detainee's due process rights by disregarding his written

---

[9] *See* Wis. JI-Civil 1005 ("Negligence: Defined") ("A person is negligent when [he or she] fails to exercise ordinary care. Ordinary care is the care which a reasonable person would use in similar circumstances. A person is not using ordinary care and is negligent, if the person, without intending to do harm, does something (or fails to do something) that a reasonable person would recognize as creating an unreasonable risk of injury or damage to a person or property.")

11

complaints about excessively long detention); *Russell v. Lazar*, 300 F.Supp. 2d 716, 720 (E.D. Wis. 2004) (plaintiff allowed to proceed on claim that prison official ignored plaintiff's complaints that his sentence had been recalculated); *Allen v. Guerrero*, 2004 WI App 188, ¶¶ 13-15, 276 Wis. 2d 679, 688 N.W.2d 673 (denial of prison officials' motion to dismiss affirmed where plaintiff alleged they intentionally kept him confined past his mandatory release date).

Plaintiff argues further that by failing to consult the chart, defendants "failed to exercise their professional judgment." Plaintiff invokes the "professional judgment" standard by referring to a deliberate indifference medical care case:[10]

> "deliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment."

Dkt. 31 at 20 (quoting *Estate of Cole v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996)). I understand plaintiff to be suggesting that the decision not to consult the penalty chart would be considered so egregious by those in the corrections profession that it evidences defendants' indifference to the risk to plaintiff. Plaintiff does not explain why it would be appropriate to import this standard from the medical care realm, where the "standard of care" is a familiar concept. Even if I concluded that it was appropriate, courts often require expert testimony to explain the scope of accepted professional judgment or practice. That would seem to be necessary here, as it is far from obvious what the "accepted professional judgment, practice, or standards" would be in this circumstance. Yet plaintiff does not present any such evidence

---

[10] Plaintiff quotes *Estate of Cole v. Fromm*, 94 F.3d 254 (7th Cir. 1996), which is a *Fourteenth Amendment* medical care case regarding a pretrial detainee, but the court applied Eighth Amendment standards in resolving the case. Nothing in this argument leads me to believe that plaintiff seeks to apply a different standard to his Fourteenth Amendment claims than to his Eighth Amendment claims.

supporting his assertion that defendants' decision not to consult the chart was outside the scope of acceptable judgment for correctional officials who review incoming inmates' sentences.

Even to the extent that defendant Sanders says that it was proper procedure to utilize the penalty charts, failure to follow internal procedures does not in and of itself mean that a constitutional violation took place.[11] *See, e.g.*, *Fuller v. Dillon*, 236 F.3d 876, 880 (7th Cir. 2001) ("failure of the prison officials to follow state administrative rules is not a denial, in and of itself, of one's due process rights"); *Lewis v. Richards*, 107 F.3d 549, 553-54 and n.5 (7th Cir. 1997) (even if prison has a policy of providing protective custody to any offender who requests it, officials' failure to follow internal procedures does not mean a constitutional violation has occurred; the plaintiff must show the officials "consciously ignored" threats to his or her safety or "took no precautions to avoid a known hazard"). Kraintz and Meissner did not consciously ignore the risk; they apparently relied on their own memory of the maximum sentence (it is undisputed that they knew the maximum term of extended supervision was three years) but simply inadvertently failed to apply that knowledge to their review.

Finally, plaintiff produces figures resulting from a study of most of the Class H and Class I felony cases in Milwaukee and Waukesha Counties in 2003, showing that about 20 other criminal defendants received overly long sentences, and none of those errors were caught by prison staff, including nine cases in which defendant Meissner proofed the initial calculation. These numbers are, quite frankly, disturbing. Plaintiff also references a 1996 report by the DOC

---

[11] Plaintiff also argues that "Where failure to act involves complete disregard of rules or explicit job requirements, such failure rises to the level of deliberate indifference," citing to *Pierson v. Hartley*, 391 F.3d 898, 903–04 (7th Cir. 2004), but this is an inaccurate interpretation of the *Pierson* case. In *Pierson*, the court concluded that the jury could reasonably conclude that prison officials were deliberately indifferent to the safety of the plaintiff when they allowed a dangerous prisoner into a unit with a less restrictive environment. The court considered all of the evidence concerning defendants' knowledge of the risk to plaintiff. It did not rule that disregarding prison policies is per se deliberate indifference.

adopted the recommendations of the Federal Bureau of Prisons that work performed by the record office requires 100% accuracy with no margin for error. The 100% accuracy requirement goes without saying; there is no question that the stakes in these reviews are very high, and any prisoner who is incarcerated beyond his legal sentence has been deprived of his rights.

Of course, the blame for that deprivation must be shared among more than just DOC officials (and starts with the sentencing judge), but it does not follow that any mistake resulting in an illegal term of incarceration shows *deliberate indifference* on the part of the blameworthy. Someone who is negligent at a certain task is capable of making repeated mistakes each time the task is performed. Plaintiff argues that "a pattern [of negligence] permits the inference of deliberate indifference," citing to *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) and *Smego v. Mitchell*, 723 F.3d 752, 757 (7th Cir. 2013).

Although this *can* be true, proving that the inference should be permitted is "a heavy burden," *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 591 (7th Cir. 1999), and the "only significance of multiple acts of negligence is that they may be evidence of the *magnitude* of the risk created by the defendants' conduct and the *knowledge* of the risk by the defendants," *Sellers v. Henman*, 41 F.3d 1100, 1102–03 (7th Cir. 1991) (emphasis added). Meissner's repeated negligent acts did not create a larger magnitude risk to plaintiff, unlike cases in which this theory has been applied, in which the repeated acts could be interpreted as showing increased disregard for one particular prisoner. *See, e.g.*, *Smego v. Mitchell*, 723 F.3d at 757) (jail dentist's repeated treatment decisions, which alone might constitute negligence, could form basis for deliberate indifference claim); *Armstrong*, 152 F.3d at 580 (jail officials' repeated refusal to help detainee who complained about excessively long detention evidenced deliberate indifference toward him). Further, the evidence of defendant Meissner's repeated mistakes does not show her knowledge of the risk—there is no evidence that she ever got feedback showing

14

that she had failed and yet persisted in her pattern of behavior. Instead, Meissner made the same mistake, many times over,[12] which shows either a blind spot towards the Class H felony sentencing problem or just simple repeated mistakes. Neither is enough to show that she acted with deliberate indifference.

## B.  Review in conjunction with parole revocation

Further review of plaintiff's sentence took place after plaintiff's release from prison and subsequent probation revocation. Defendant Haroski initially provided plaintiff's probation agent with plaintiff's time left available for reincarnation and later calculated plaintiff's sentence upon his reincarceration at DCI. Defendant Hackbarth proofed Haroski's reincarceration sentence calculation. In performing these tasks, neither Haroski nor Hackbarth referred to plaintiff's judgment of conviction; instead they used the admission computation sheet previously filled out by defendant Kraintz and proofed by defendant Meissner.

Plaintiff argues that Haroski and Hackbarth ignored the portion of their job duties that required them to evaluate the legality of plaintiff's sentence, again noting that they did not follow the proper procedures as outlined by defendant Sanders. Defendants dispute that these were the proper procedures (a dispute of fact that must be decided in plaintiff's favor for purposes of summary judgment), but in any case, as stated above, the mere fact that defendants failed to follow internal procedures does not mean they violated plaintiff's constitutional rights. The question is whether they acted with deliberate indifference to the risk of plaintiff serving an illegally long sentence.

---

[12] As defendants point out, the data is not nearly comprehensive enough to indicate how Meissner performed in relation to her entire workload as a reviewer of sentence calculations (although a zero-for-nine record in catching the mistakes from two counties is an extremely dubious start).

Defendants state that they relied on the previous work performed by Kraintz and Meissner; they were not aware that the original admission computation was incorrect and did not have any reason to think it was incorrect. Plaintiff attempts to dispute this fact by citing to defendants' admission that they were aware that many offenders were oversentenced by judges in the wake of the implementation of Truth in Sentencing II. However, all this shows is that there were many incorrect *sentences*; it does not adequately dispute defendants' statement that they believed Kraintz and Meissner's *calculations* to be correct. While it may have been negligent for Haroski and Hackbarth not to perform a backup review of plaintiff's sentence by looking at plaintiff's judgment of conviction, the facts produced by the parties could not lead a reasonable jury to conclude that Haroski and Hackbarth acted with deliberate indifference where the calculation had already been made by one official and proofed by another.

## C.  Failure to supervise or train

Plaintiff's amended complaint includes claims against both defendants Kraintz and Sanders for failing to train or supervise workers in their sentence-review responsibilities. Defendants note that at the times relevant to this action, defendant Kraintz was "a lead worker, not a supervisor." Plaintiff does not dispute this. Additionally, in his brief opposing summary judgment he does not include any argument regarding Kraintz's liability as a supervisor, instead only discussing Kraintz's actions in directly reviewing plaintiff's sentence. Therefore, I will grant summary judgment to defendants on plaintiff's claim regarding Kraintz's failure to train or supervise.

That leaves defendant Sanders. As an initial matter, to the extent that plaintiff labels at least part of his claim as a "failure to train" claim, such a claim cannot be brought against defendant as an individual. *Sanville v. McCaughtry*, 266 F.3d 724, 739-40 (7th Cir. 2001)

16

("failure to train claims are usually maintained against municipalities, not against individuals, and, in the Eighth Amendment context, such claims may only be maintained against a municipality") (internal citations omitted). Nor can Sanders be sued in her official capacity. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (states or state officials sued in official capacity are not "persons" within the meaning of 42 U.S.C. § 1983).

Additionally, the doctrine of *respondeat superior* does not apply to § 1983 actions; to be held individually liable for her acts as a supervisory official, defendant Sanders must be "personally responsible for the deprivation of a constitutional right." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001); *see also Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based upon personal liability and predicated upon fault."). A defendant acting in a supervisory capacity must still be deliberately indifferent to the harm facing plaintiff; the supervisor "must know about the [employee's] conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [she] might see." *Chavez*, 251 F.3d at 651.

Defendants argue that Sanders cannot be held liable for her acts in failing to properly supervise without a finding that defendants Kraintz, Meissner, Haroski, or Hackbarth are liable on the underlying deliberate indifference claims, citing *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997). This proposition is commonly invoked in excessive force cases in which the plaintiff seeks *Monell*-type[13] liability against a municipality or a supervisor in his or her official capacity even where the court concludes that law enforcement did not use excessive force in the incident at issue. *Estate of Phillips*, 123 F.3d at 597 ("The City and Chief Arreola

---

[13] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (local governmental unit can be directly liable under § 1983 when execution of government policy or custom inflicts constitutional injury).

'were sued only because they were thought legally responsible for [the officers'] actions; if the latter inflicted no constitutional injury on [Mr. Phillips], it is inconceivable that [the former] could be liable to [the plaintiffs].'" (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam)). I am reluctant to extend *Estate of Phillips* to a claim against an individual defendant because it stands to reason that a supervisor who intentionally allows her staff to act with gross negligence could in fact be acting with deliberate indifference herself.

But that would be a very difficult claim to prove, and the undisputed facts do not support it here. In a recent decision, the Supreme Court rejected the plaintiff's argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). "[P]urpose rather than knowledge" is required to impose "supervisory liability." *Id.* (emphasis added). The Seventh Circuit has elaborated on this requirement, stating:

> *Iqbal* held that knowledge of subordinates' misconduct is not enough for liability. The supervisor must want the forbidden outcome to occur. Deliberate indifference to a known risk is a form of intent. But *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), holds that, to show scienter by the deliberate-indifference route, a plaintiff must demonstrate that the public official knew of risks with sufficient specificity to allow an inference that inaction is designed to produce or allow harm. A warden's knowledge that violence occurs frequently in prison does not make the warden personally liable for all injuries. *See McGill v. Duckworth*, 944 F.2d 344 (7th Cir. 1991). Prisons are dangerous places, and misconduct by both prisoners and guards is common. Liability for wardens would be purely vicarious. *Farmer* rejected a contention that wardens (or guards) can be liable just because they know that violence occurs in prisons and don't do more to prevent it on an institution-wide basis. To get anywhere, Vance and Ertel would need to allege that Rumsfeld knew of a substantial risk to security contractors' employees, and ignored that risk because he wanted plaintiffs (or similarly situated persons) to be harmed. The complaint does not contain such an allegation and could not plausibly do so.

18

In the present case, plaintiff presents evidence showing that, at most, defendant Sanders was not actively involved in ascertaining whether DOC staff were properly reviewing prisoners' sentences. Plaintiff comes nowhere close to showing that Sanders *wanted* her staff to negligently review sentences. As with the other defendants, Sanders was at most negligent in her oversight of the sentence review process, but this is not sufficient to sustain an Eighth Amendment claim. Therefore I will grant defendants' motion for summary judgment on the supervisory claim against Sanders.

ORDER

IT IS ORDERED that:

1.      Defendants' motion for summary judgment, Dkt. 15, is GRANTED.

2.      The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 6th day of November, 2014.

BY THE COURT:

/s/
JAMES D. PETERSON
District Judge